# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION - LEXINGTON

| | |
|---|---|
| **GARY WEST, et al.,** | **CIVIL ACTION NO. 5:19-211** |
|     **Plaintiffs,** | |
| **v.** | <u>**OPINION AND ORDER**</u> |
| **KENTUCKY HORSE RACING COMMISSION, et al.,** | |
|     **Defendants.** | |

**\*\*\* \*\*\* \*\*\***

This matter is before the Court on the defendants' motion (DE 19) to dismiss the complaint filed by plaintiffs Gary and Mary West. The Wests' horse Maximum Security ran in the 2019 Kentucky Derby and crossed the finish line before all other 18 horses in the race. After reviewing objections lodged by two jockeys after the race, however, Kentucky racing officials disqualified Maximum Security from the first-place finish. The Wests ask this Court to reverse that decision and to also find that the decision violated their constitutional rights to due process.

Kentucky's regulations make clear that the disqualification is not subject to judicial review. Further, the disqualification procedure does not implicate an interest protected under the Due Process Clause of the U.S. Constitution. Accordingly, the Court must grant the motion to dismiss.

## I. Background

On a motion to dismiss, the Court must assume that all the factual allegations in the Wests' complaint are true. *Scheid v. Fanny Farms Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988). Accordingly, the factual basis of this opinion comes solely from the facts alleged in the complaint.

The Wests own a thoroughbred racehorse named Maximum Security, who ran in the Kentucky Derby on May 4, 2019. The Wests assert that the defendants wrongfully failed to declare Maximum Security the winner of the Derby even though he crossed the finish line before every other horse in the race.

The defendants are the Kentucky Horse Racing Commission, its executive director, and its members and "stewards."

The Kentucky Horse Racing Commission is an agency of the Kentucky state government. It is charged with regulating "the conduct of horse racing and pari-mutuel wagering on horse racing, and related activities within the Commonwealth of Kentucky." KRS § 230.225(1). It has jurisdiction over all horse race meetings that take place in Kentucky. KRS § 230.260(1). It is also authorized "to prescribe necessary and reasonable administrative regulations and conditions under which horse racing at a horse race meeting shall be conducted in this state." KRS § 230.260 (8).

The commission consists of 15 members appointed by the governor. KRS § 230.225(2)(a). The governor appoints one member to act as chair, and another to

act as vice-chair. KRS § 230.225(3)(b), (c). The governor also appoints the commission's executive director. KRS § 230.230(1).

A "steward" is an appointed racing official. 810 KAR 1:001 § 1(72). [1] Stewards exercise "immediate supervision, control, and regulation of racing at each licensed race meeting on behalf of and responsible only to the commission." 810 KAR 1:004 § 3. There must be three stewards at each meet, including a "chief steward." 810 KAR 1:004 § 2(a). The stewards determine "all questions, disputes, protests, complaints, or objections concerning racing which arise during a race meeting" and enforce the determinations. 810 KAR § 3(2). All three stewards at the Kentucky Derby are defendants in this case.

In the 2019 Kentucky Derby, Maximum Security crossed the finish line first. But after the race, jockeys on two other horses in the race – Country House and Long Range Toddy – lodged oral objections against Maximum Security. Country House had finish second in the race, just behind Maximum Security. Long Range Toddy had finished 17th.

After considering the objections, Chief Steward Barbara Borden read an announcement stating that the stewards had conducted a lengthy review of the race and had determined that, during the race, Maximum Security had "drifted out and impacted the progress" of the horse War of Will, which caused interference with

---

[1] The commission recently revised the regulations relating to horse racing. Those revisions became effective on May 31, 2019, which was after the running of the 2019 Derby. In the complaint and briefing on this motion, both parties have cited the versions of the regulations in effect at the time of events at issue. The Court has done the same in this opinion. The revisions to the regulations relevant to this matter were not substantive.

Long Range Toddy. Borden stated that the stewards had unanimously determined to disqualify Maximum Security from the first-place finish. In accordance with what Borden described as "typical procedure," the stewards determined that Maximum Security would be placed 18th in the race, just behind Long Range Toddy (who had finished 17th), the lowest-placed horse that Maximum Security had "bothered."

Having disqualified Maximum Security from the first-place finish, the stewards declared Country House, who had finished second just behind Maximum Security, the winner of the 2019 Kentucky Derby.

Two days later, the Wests delivered a completed Kentucky Horse Racing Commission form titled Notice of Appeal to the commission. (DE 1-1, May 6, 2019 Letter to Stout & Notice of Appeal.) In it, the Wests asserted that the stewards' "acts in reviewing the 145th running of the Kentucky Derby were arbitrary and capricious and did not comply with applicable administrative regulations." The Wests also asserted that the "determination to disqualify MAXIMUM SECURITY is not supported by substantial evidence."

On the same day, the Wests delivered a letter to the commission's executive director, which they stated was a formal notification that the Wests "hereby submit their complaint and protest of the Stewards' arbitrary and capricious acts" in reviewing the Derby. The Wests asked that their "complaint, protest, objection, and appeal be heard forthwith by the full Kentucky Horse Racing Commission." They further asked that they be provided with "notice and an opportunity to be present at any meeting or proceeding at which MAXIMUM SECURITY's disqualification or

the Wests' complaint, protest, objection, and appeal is discussed or reviewed." (DE 1-1, May 6, 2019 Letter to Guilfoil.)

The Wests also requested copies of various items involved in the stewards' determination, stating:

> Finally, we ask for copies of all views considered by the Stewards in connection with their decision to disqualify MAXIMUM SECURITY; recordings of all statements made by jockeys, trainers, and others that were obtained and considered by the Stewards in reaching that determination; the Stewards' notes concerning and the recording of their nearly 22 minutes of deliberations; any written decision issued by the Stewards with respect to MAXIMUM SECURITY's disqualification, and all daily logs and minute banks maintained by the Stewards" for the 2019 Derby.

(DE 1-1, May 6, 2019 Letter to Guilfoil.)

By letter dated the same date, the commission's general counsel informed the Wests that "the stewards' disqualification determination is not subject to appeal." (DE 1-1, May 6, 2019 Forgy Letter.) The Wests then filed this action. The defendants have moved to dismiss the complaint. The Court granted all parties' requests to file briefs exceeding the page limits imposed under the Local Rules.

## II.    Claims

The Wests assert two kinds of claims in this action. (DE 29, Response at 1-2.)

First, with Counts I through V of the complaint, the Wests ask this Court to review the stewards' decision disqualifying Maximum Security pursuant to a state statute that governs judicial review of final orders by administrate agencies. KRS §

13B.150. That statute provides that a reviewing court may reverse a state agency's "final order" if it finds the order is:

> (a) In violation of constitutional or statutory provisions;
> (b) In excess of the statutory authority of the agency;
> (c) Without support of substantial evidence on the whole record;
> (d) Arbitrary capricious, or characterized by abuse of discretion;
> . . . .
>     or
> (g)    Deficient as otherwise provided by law.

KRS § 13B.150(2)(a)-(d), (g).

Counts I through V ask the Court to reverse the stewards' decision disqualifying Maximum Security under each of these five provisions.[2]

The second kind of claim asserted by the Wests is a violation of their rights under the U.S. Constitution. These claims are asserted in Counts VI and VII of the complaint.

In Count VI, the Wests assert that a Kentucky regulation that deals with "fouls" during the running of a race is so vague that it violates their rights to due process under the Fourteenth Amendment to the U.S. Constitution. *See* 810 KAR 1:016 § 12 ("Section 12").

The only way to assert a constitutional claim against a state official is through a claim under 42 U.S.C. § 1983. *Foster v. Michigan*, 573 F. App'x 377, 391 (6th Cir. 2014) ("To the extent that Appellants attempt to assert direct

---

[2] (DE 1, Complaint, Count I (KRS § 13.150(2)(c) substantial evidence); Count II (KRS § 13B.150(2)(a) violates Constitution); Count III (KRS § 13B.150(2)(b) exceeds the commission's statutory authority); Count IV (KRS § 13B.150(2)(d) abuse of discretion); Count V (KRS § 13B.150(2)(g) otherwise deficient).)

constitutional claims, they fail; we have long held that § 1983 provides the exclusive remedy for constitutional violations.") (citing *Thomas v. Shipka*, 818 F.2d 496, 499 (6th Cir. 1987), *vacated and remanded on other grounds*, 488 U.S. 1036 (1989)). That statute provides in relevant that every "person" acting under the color of state law who deprives any citizen of any constitutional rights "shall be liable to the party injured…." 42 U.S.C.A. § 1983. While the complaint does not state explicitly that the vagueness claim is asserted under § 1983, the Wests clarify in their response that it is. (DE 29, Response at 2, 13.)

In Count VII of the complaint, the Wests do explicitly purport to assert a claim under 42 U.S.C. § 1983. In Count VII itself, the Wests do not elaborate on how the defendants violated their constitutional rights. They merely recite the words of § 1983 and refer to the other allegations in the complaint. The Wests do explicitly allege in Count II of the complaint that the "process followed by the Stewards in disqualifying Maximum Security failed to comport with the minimum requirements of Procedural Due Process under the Fourteenth Amendment . . . ." (DE 1 Complaint ¶ 124.) As discussed, however, Count II asserts a claim under a KRS § 13B.150(2)(a), which is a state statute permitting a reviewing court to reverse an agency's final order if it is "[i]n violation of constitutional or statutory provisions." (DE 1, Complaint, ¶ 118.)

Nevertheless, the Wests clarify in their response to the motion to dismiss that they allege "four separate Fourteenth Amendment due process violations" under § 1983. (DE 29, Response at 11.) Three of these involve the process the

stewards followed in reaching their decision to disqualify Maximum Security from the first-place finish. (DE 29, Response at 12-13.) The final alleged due process violation is the vagueness challenge to the state regulation regarding fouls. (DE 29, Response at 13.) This comports with the defendants' interpretation of the complaint in their motion to dismiss.

For these reasons, the Court will interpret both Counts VI and VII to assert § 1983 claims for violations of the Wests' due process rights. Count VI asserts a vagueness challenge to the commission's regulation regarding fouls. Count VII asserts that the defendants violated the West's constitutional rights to due process in the way they disqualified Maximum Security from the first-place finish.

## III. Analysis

### A. Subject-Matter Jurisdiction

A threshold issue for this federal Court is subject-matter jurisdiction. "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Congress has conferred on district courts jurisdiction to preside over certain kinds of actions. This Court has jurisdiction over civil actions arising under the Constitution and federal laws. 28 U.S.C. § 1331. This is referred to as "federal-question jurisdiction." Congress has also conferred on federal courts jurisdiction over civil actions involving citizens of diverse state citizenship where the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a)(2). This is referred to as "diversity jurisdiction."

And, in any action where the Court has federal-question or diversity jurisdiction over some claims, this Court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C.A. § 1367(a).

The Court obviously has federal-question jurisdiction over the Wests' claims that the defendants violated their due process rights under the U.S. Constitution. With Counts I through V of the complaint, however, the Wests ask this Court to review and reverse the stewards' decision pursuant to KRS § 13B.150, which, as discussed, is a state statute that provides for judicial review of the final orders of state agencies. While Count II asserts that the stewards' decision should be reversed because the stewards violated the Constitution in reaching the decision, the rest of these counts could not be viewed as raising any federal question. In a footnote in their motion to dismiss, the defendants seem to question this Court's authority to exercise jurisdiction over the Wests' claims for appellate review under KRS § 13B.150. (DE 19-1, Mem. at 24 n.18.) Nevertheless, these claims are part of the "same case or controversy" as the Wests' constitutional claims. All claims challenge the stewards' decision to disqualify Maximum Security. Thus, this Court has supplemental jurisdiction over the state-law claims for judicial review.

The Supreme Court has made clear that a federal court may exercise supplemental jurisdiction over claims seeking judicial review of a local agency action pursuant to a state statute, just the same as a federal court can exercise

supplemental jurisdiction over more typical state-law claims like breach of contract or negligence.

In *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 159 (1997), the Chicago landmarks commission denied the International College of Surgeons' applications for permits to demolish buildings they owned that were located in a "landmark district." The college ultimately filed a complaint in state circuit court pursuant to an Illinois statute providing that an action for judicial review of the commission's final decisions could be filed in state court. The college also asserted various federal constitutional claims, including that the commission had violated the college's due process rights by the way it reached its decision, and that the local ordinances at issue violated due process.

 The landmarks commission removed the action to federal court, which exercised supplemental jurisdiction over the claims for judicial review. The Seventh Circuit determined this was wrong, finding that a "deferential review of state agency action was an appellate function that was 'inconsistent with the character of a court of original jurisdiction.'" *Id*. at 161-62 (quoting *Int'l Coll. of Surgeons v. City of Chicago, Ill*., 91 F.3d 981, 990 (7th Cir. 1996)).

The Supreme Court reversed finding that the college's state court complaints raised issues under federal law. *Id*. at 164. And because, after removal, the district court had federal-question jurisdiction over those claims, it "could exercise supplemental jurisdiction over the accompanying state law claims so long as those

claims constitute 'other claims that . . . form part of the same case or controversy.'" *Id*. at 165 (quoting § 1367(a)).

The Court determined that the state and federal claims formed part of the same case or controversy because they "derived from a common nucleus of operative fact, namely, [the college's] unsuccessful efforts to obtain demolition permits" from the commission. *Id*. (internal citations and quotations omitted). "That is all the statute requires to establish supplemental jurisdiction (barring an express statutory exception, see § 1367(a))." *Id*. at 165.

The Court explicitly rejected any "exception to supplemental jurisdiction for claims that require on-the-record review of a state or local administrative determination." *Id*. at 169. "Instead, the statute [§ 1367(a)] generally confers supplemental jurisdiction over 'all other claims' in the same case or controversy as a federal question, without reference to the nature of review." *Id*.

In addition to supplemental jurisdiction over the Wests' state-law claims, this Court also likely has diversity jurisdiction over them. The Wests are California citizens and all the defendants are Kentucky citizens. As to the amount in controversy, the winnings of the Kentucky Derby exceed $75,000. That is all that is required for diversity jurisdiction. 28 U.S.C. § 1332(a)(1). *See also BNSF Ry. Co. v. O'Dea*, 572 F.3d 785, 790-91 (9th Cir. 2009) (holding after *City of Chicago* that district courts have diversity jurisdiction over appeals from state administrative agency decisions  and finding it "difficult to see a principled distinction between

federal question jurisdiction under 28 U.S.C. § 1331. . . and diversity jurisdiction under 28 U.S.C. § 1332. . . . ")

Nevertheless, in *City of Chicago*, the Supreme Court explicitly declined to address whether state-law claims for review of local agency decisions fall within federal diversity jurisdiction. *Id.* at 172. This Court also has no need to address that issue, having determined it has supplemental jurisdiction over the state-law claims.

As the defendants point out in their motion to dismiss, the Kentucky statutes governing judicial review of agency final orders provide that "[a] party shall institute an appeal by filing a petition in the Circuit Court of venue. . . ." KRS § 13B.140(1). (DE 19-1, Mem. at 24 n.18.) The statute does not explicitly provide for an appeal in federal court. Nevertheless, "[i]t is generally true that the jurisdiction of the federal courts 'cannot be limited or taken away by state statutes.'" *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 798 (6th Cir. 2012) (citing 17A Wright, et al., *Federal Practice & Procedure* § 4211 (3d ed. 2012)). "In determining jurisdiction, district courts of the United States must look to the sources of their power, Article III of the United States Constitution and Congressional statutory grants of jurisdiction, not to the acts of state legislatures." *Duchek v. Jacobi*, 646 F.2d 415, 419 (9th Cir. 1981). "However extensive their power to create and define substantive rights, the states have no power directly to enlarge or contract federal jurisdiction." *Id.*

"A state cannot confer rights upon private parties and require that litigation between those parties must be confined to the courts of the state itself." *BNSF*, 572

F.3d at 788. *See also Hindes v. FDIC*, 137 F.3d 148, 168 n.15 (3d Cir. 1998) (holding that "a state statute cannot be applied so as to limit a federal court's supplemental jurisdiction"); *Poarch v. City of Gatlinburg*, 852 F.2d 1288 (6th Cir. 1988) (unpublished) ("We agree with the district court that a state statute cannot deprive a federal court of diversity jurisdiction by providing that a claim actionable under state law may be prosecuted only in a state court."); *Griffith v. Bank of N.Y.*, 147 F.2d 899, 904 (2d Cir. 1945) ("[I]t is well settled that state statutes cannot limit the jurisdiction . . . of the federal courts.")

Further, the statute under which the plaintiff sought review of the local agency action in *City of Chicago* also provided for review in state circuit court. *City of Chicago*, 522 U.S. at 159. The Supreme Court nonetheless determined that the claim for review fell within the federal court's supplemental jurisdiction.

Finally, the Court sees no reason to decline to exercise jurisdiction over the claims for review of the stewards' decision. "[F]ederal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996). The defendants have not explicitly asked the Court to decline jurisdiction over the claims. While the supplemental jurisdiction statute permits the Court to decline to exercise jurisdiction over state-law claims, none of the reasons it provides for doing so is applicable. 28 U.S.C. § 1367(c).

Nor does the Court see any reason to *abstain* from exercising its jurisdiction over the state-law claims. In *City of Chicago*, the Court noted that, under abstention

doctrines articulated by the Court, "there may be situations in which a district court should abstain from reviewing local administrative determinations even if the jurisdictional prerequisites are otherwise satisfied." *City of Chicago*, 522 U.S. at 174. The abstention doctrines "embody the general notion that 'federal courts may decline to exercise their jurisdiction, in otherwise exceptional circumstances, where denying a federal forum would clearly serve an important countervailing interest, for example where abstention is warranted by considerations of proper constitutional adjudication, regard for federal-state relations, or wise judicial administration.'" *Id.* (quoting *Quackenbush*, 517 U.S. at 716). The defendants have not asked the Court to abstain from exercising jurisdiction over the state-law claims. Further, the Court does not find any of the abstention doctrines applicable here.

Thus, this federal court can and will exercise jurisdiction over the claims for judicial review of the stewards' decision under KRS § 13B.150.

## B. Judicial Review of the Stewards' Decision

As discussed, the claims for judicial review are asserted in Counts I through V of the complaint. The Wests ask the Court to reverse the stewards' "final order" pursuant to various provisions of KRS § 13B.150. In their complaint, the Wests define the "final order" under review as the stewards' "final order disqualifying Maximum Security." (DE 1, Complaint, ¶ 34.) The state regulations governing the determinations of fouls and disqualifications of horses explicitly provide, however, that the stewards' decision is final and not subject to appeal.

Section 4 of 810 KAR 1:017 ("Section 4") requires stewards to:

a) Make all findings of fact as to all matters occurring during and incident to the running of a horse race;
b) Determine all objections and inquiries based on interference by a horse, improper course run by a horse, foul riding by a jockey, and all other matters occurring during and incident to the running of a race; and
c) Determine the extent of disqualification, if any, of horses in a race for a foul committed during the race.

810 KAR 1:017 § 4(1)(a)-(c).

Section 4 specifically provides that all these findings and determinations, including a horse's disqualification for a foul committed during the race are "final and shall not be subject to appeal." 810 KAR 1:017 § 4(2).

In their response, the Wests do not explain why the Court should simply ignore this regulation and conduct an appellate review of the stewards' decision. The Kentucky Court of Appeals has determined that the regulation is "dispositive" on the issue of whether there is a right to appeal the stewards' decision to disqualify a horse. *March v. Kentucky Horse Racing Commission,* No. 2013-CA-000900-MR, 2015 WL 3429763, * 2 (Ky. Ct. App. Feb. 10, 2016). The Wests argument that *March* confers on courts the authority to judicially review the stewards' decision at issue here reflects a misunderstanding of that case. Based on Section 4 alone, the Kentucky Court of Appeals determined that the stewards' decision to disqualify a horse is "final and non-appealable." *Id.*

Despite the plain language of Section 4, the Wests insist the stewards' decision is reviewable under KRS § 13B.150. Perhaps the Wests rely on the

directive in Chapter 13B that its provisions "supersede any other provisions of the Kentucky Revised Statutes and administrative regulations. . . to the extent these other provisions are duplicative or in conflict." KRS § 13A.120(2). Thus, if KRS § 13B.150 grants the Wests the right to judicial review of the stewards' decision as they contend, then it controls despite the explicit language in Section 4. The statute does not, however, grant the Wests that right.

Under Chapter 13B, only "final orders" of an agency are subject to judicial review. KRS § 13B.140(1). Chapter 13B defines a "final order" as "the whole or part of the final disposition of an administrative hearing . . . ." KRS § 13B.010(6). An "administrative hearing" is "any type of formal adjudicatory proceeding conducted by an agency as required or permitted by statute or regulation to adjudicate the legal rights, duties, privileges, or immunities of a named person." KRS § 13B.010(2).

The stewards' decision disqualifying Maximum Security was not the product of an "administrative hearing." There was no "formal adjudicatory proceeding." There is no provision in Section 4 or any of the other regulations governing the determination of fouls and disqualifications in the running of a horse race that requires a formal adjudicatory process with regard to such determinations.

Whether this procedure violates due process as the Wests argue is a separate question from whether the applicable statutes and regulations grant the Wests the right to judicial review of the stewards' decision. The Court will address the due process question below. With Counts I through V of the complaint, however, the Wests asks this Court to review and reverse the stewards' decision under KRS §

13B.150(a), (b), (c), (d), and (g). The Court must first determine whether Chapter 13B grants the Wests the right to such judicial review. It does not. Accordingly, these claims must be dismissed.

### C. Due Process

For the reasons discussed, the Court has interpreted the complaint to assert not only a claim under KRS § 13B.150 seeking reversal of the stewards' ruling based on an alleged due process violation, but also to assert a claim under 42 U.S.C. § 1983 that the stewards' decision violated the Wests' constitutional right to due process. (DE 29, Response at 11.)

The next issue is which defendants the Wests assert this constitutional claim against. Again, § 1983 provides for the liability of every "person" who, acting under the color of state law, deprives any citizen of his or her constitutional rights. 42 U.S.C.A. § 1983. In Count VII, the Wests state the constitutional claim is against the "Defendants" generally. But they cannot assert a § 1983 claim against the commission itself. This is because the commission is a state agency, and the Supreme Court has held that § 1983 does not allow claims directly against a state. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989); *Reese v. Indus. Comm'n of Ohio*, 3 F. App'x 340, 342 (6th Cir. 2001) ("[S]tate agencies, such as the defendants in this case, are not considered a 'person' for purposes of liability under § 1983.")

As to the commission executive director and the members and stewards, in the complaint, the Wests state they assert claims against these defendants in both

their *individual* and *official* capacities. For purposes of this opinion, the Court has assumed that all these defendants are state officials.

"[A] state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will*, 491 U.S. at 71 n.10 (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)). But, any claim for damages under § 1983 against state officials in their *official* capacities must be dismissed because the suit is deemed to be a suit against the state. *Hafer v. Melo*, 502 U.S. 21, 27 (1991) ("State officers sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them."); *Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010).

Government officials may, however, be held personally liable for damages under § 1983 when they are sued in their *individual* capacities. *Hafer*, 502 U.S. at 27 ("[O]fficers sued in their personal capacity come to court as individuals. A government official in the role of personal-capacity defendant thus fits comfortably within the statutory term 'person.'") The Wests' complaint does not, however, assert that the individual defendants should be held personally liable for damages.

Accordingly, the Court construes the complaint to assert a § 1983 claim for injunctive and declaratory relief against the commission's executive director and its members and stewards in their official capacities. The Court will refer to these individuals collectively as the defendants in this portion of the opinion.

In their response brief, the Wests argue that these defendants violated their due process rights in four ways. (DE 29, Response at 12.) First, they argue that the stewards "failed to follow Section 17 and the mandatory requirements of Section 12 in disqualifying Maximum Security." (DE 29, Response Brief at 12.). As discussed, "Section 12" is the regulation dealing with fouls in horse races. 810 KAR 1:016 § 12. "Section 17" is a regulation dealing with the stewards' decision as to the "official order of finish." 810 KAR 1:016 § 17 ("Section 17").

Second, the Wests argue that the defendants "failed to comply with Section 5's mandatory requirement that Maximum Security be declared co-winner of the Derby." (DE 29, Response at 12.) "Section 5" refers to the Kentucky state regulations regarding disputes in a race that has been declared official. 810 KAR 1:017 §5 ("Section 5"). Third, the Wests argue that their due process rights were violated by "the process [the stewards and commission members] followed … in disqualifying Maximum Security." (DE 29, Response at 13.) Finally, the Wests argue that their due process rights were violated because Section 12 is too vague to provide proper notice as to what conduct is prohibited. (DE 29, Response at 13.)

As to the first two arguments – that the Wests' due process rights were violated by the stewards' alleged failure to abide by Sections 5, 12, and 17 –a state official's failure to abide by the state's own regulations does not, by itself, rise to the level of a constitutional violation. "A state cannot be said to have a federal due process obligation to follow all of its procedures; such a system would result in the constitutionalizing of every state rule, and would not be administrable." *Purisch v.*

*Tennessee Tech. Univ.*, 76 F.3d 1414, 1423 (6th Cir. 1996) (quoting *Levine v. Torvik*, 986 F.2d 1506, 1515 (6th Cir.1993), *overruled in part on other grounds by Thompson v. Keohane*, 516 U.S. 99, 111 (1995)).

As to the remaining two due process claims, the Due Process Clause prohibits the government from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This means that individuals have a right to some procedures that provide them notice and an opportunity to be heard before the state can deprive them of the "life, liberty, or property" interests protected by the clause. *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971) ("[T]here can be no doubt that at a minimum [the words of the Due Process Clause] require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.")

The notice requirement of the due process clause also means that the government cannot take away someone's life, liberty, or property under a law "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Laws that are impermissibly vague must be invalidated. *Id.*

"Although most often invoked in the context of criminal statutes, the prohibition on vagueness also applies to civil statutes. . . . " *Dimaya v. Lynch*, 803 F.3d 1110, 1113 (9th Cir. 2015). The standard for whether a provision is void for vagueness, however, is less stringent when the challenged provision contains "civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).

To succeed on these due process claims, the Wests must establish that a "life, liberty, or property" interest is implicated by the government's conduct. *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002). "Without a protected liberty or property interest, there can be no federal procedural due process claim." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972)).

This is true for the Wests' due process complaints about both the procedure the stewards followed and the alleged vagueness of Section 12. *See Tomaszczuk v. Whitaker*, 909 F.3d 159, 164 (6th Cir. 2018) (holding that an individual "must establish that [he or she] has been deprived of a life, liberty, or property interest sufficient to trigger the protection of the Due Process Clause" in order to raise a void-for-vagueness challenge to a statute); *Riddick v. Semple*, No. 3:18-CV-408 (SRU), 2018 WL 3962935, at *2 (D. Conn. Aug. 18, 2018) ("[B]ecause a vagueness challenge is essentially a due process challenge, a prisoner making such a challenge must establish that he was deprived of a liberty or property interest"); *M.B. by &*

*through Brown v. McGee*, No. 3:16CV334, 2017 WL 1364214, at *7 (E.D. Va. Mar. 24, 2017) ("Because the vagueness doctrine amounts to a due process challenge based on lack of notice, a court may not reach the merits of a plaintiff's void for vagueness claim unless the plaintiff first shows that state action deprived him or her of a constitutionally protected liberty or property interest.")

The Wests have not made this showing. Accordingly, their claims based on the Due Process Clause must be dismissed.

The Wests assert they have a protected property interest in "any and all of the financial and other benefits that they would otherwise have received as the result of Maximum Security winning the Derby." (DE 1, Complaint ¶ 121.) "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. Constitutionally protected property interests are not created by the Constitution itself but rather by "existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id*.

"[A] party cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary." *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir.2002). Thus, in order to establish a constitutionally protected property interest in "all the financial and other benefits" of winning the Kentucky Derby, the Wests "must point to some

policy, law, or mutually explicit understanding that both confers the benefit and limits the discretion of the [state] to rescind the benefit." *Id*. at 410.

The Wests fail to do this. In their response brief, the Wests argue there was a mutual understanding between them and the defendants "that when the Stewards determined whether to disqualify Maximum Security they would do so in strict conformity with the legal requirements of Section 12." (DE 29, Response at 16.) This may establish a mutual understanding that the stewards would follow Section 12, but it does not establish a mutual understanding that the Wests would receive the benefits of winning the Kentucky Derby – the property interest that the Wests' claim they were deprived of by the stewards' decision.

The Wests argue in the headings of their response brief that the stewards' alleged failure to comply with Sections 5 and 12 "Provide Plaintiffs With a Protectable Property Interest." (DE 29, Response at 16, 19.) The commission's alleged failure to comply with state regulations, however, does not confer on the Wests a property interest. An aggrieved party may have some cause of action where the state fails to abide by its own regulations. But the issue here is whether the Wests have asserted a particular kind of cause of action – a violation of their Constitutional due process rights. In order to assert that kind of claim, the Wests must allege that the state deprived them of something to which they were entitled.

To that end, the Wests also argue that under Sections 5 and 12, the stewards had no discretion in whether to award the Wests the benefits of winning the Kentucky Derby. (DE 29, Response at 20.)

Again, Section 12 deals with "fouls" during a race. 810 KAR 1:016 § 12.

Section 5 deals with the procedures that apply when a race result is placed in

dispute. 810 KAR 1:017 § 5.

Section 12 provides the following regarding fouls:

> A leading horse if clear is entitled to any part of the track.
> If a leading horse or any other horse in a race swerves or is
> ridden to either side so as to interfere with, intimidate, or
> impede any other horse or jockey, or to cause the same
> result, this action shall be deemed a foul. If a jockey strikes
> another horse or jockey, it is a foul. If in the opinion of the
> stewards, a foul alters the finish of a race, an offending
> horse may be disqualified by the stewards.

810 KAR 1:016 § 12.

This provision does not confer on the Wests the benefits of winning the Derby

or limit the stewards' discretion in determining who the winner of the Derby is. In

fact, it grants the stewards complete discretion in determining whether a foul

"alters the finish of a race" and provides that, if in the stewards' "opinion" it did,

then the stewards "may" disqualify the offending horse.

As to the Wests' argument that Section 5 grants them the right to the

benefits of winning the Kentucky Derby, that regulation dictates what occurs with

the purse money and trophy while the stewards are resolving a dispute after the

results of a race have been declared "official." It provides:

> Dispute of a Race after Declared Official for Pari-mutuel
> Payoff. If the result of a race is placed in dispute by the
> lodging of an objection or complaint or by discovery of an
> alleged violation of an administrative regulation, after the
> race has been declared official for pari-mutuel payoff, the
> procedures established in this section shall apply pending
> final determination of the disputed race.

(1) The purse money and trophy to which the horse objected to may have been entitled shall be withheld and placed in escrow by the association until final adjudication of the dispute; except the stewards may order any portion of the purse money to be distributed if the distribution would not be affected by the determination of the dispute.

(2) If purse money or trophy has been awarded to an owner prior to the lodging of an objection or discovery of an alleged violation of an administrative regulation which places the outcome of a race in dispute, the money or trophy shall be returned immediately to the association on order of the stewards. Upon final adjudication of the dispute, the person deemed to be entitled to the purse money or trophy shall be entitled to an order of recovery from any person or association holding the same.

(3) The horse that crossed the finish line first and any other horse that may become the winner of a disputed race shall be considered winners of that race until the matter is finally adjudicated.

810 KAR 1:017 § 5.

Section 5 does not grant any person the right to the benefits of winning any horse race including the Derby. It merely dictates the procedure to follow if a race result is placed in dispute after it has been declared official. No portion of it requires that the stewards award the purse money or any other benefit of winning a race to any person until the dispute is resolved.

The Kentucky Court of Appeals has faced this issue before. In *March*, like here, the plaintiff's horse crossed the finish line first, but the stewards disqualified the horse after finding that his jockey had committed a foul. The plaintiff filed an

action in Kentucky state court. Among other claims, the plaintiff argued that the decision violated due process because it required him to forfeit the purse money without a hearing. The Court of Appeals rejected that argument, finding that the plaintiff "never had an entitlement to the purse monies because [his horse] did not win the race." *March*, 2015 WL 3429763 at *3. The plaintiff was not required to "forfeit" the purse, "he simply did not win it to begin with." *Id*. As was the case in *March*, the West's "interest in the purse money does not constitute the required protected property interest" that would permit a due process challenge. *Id*.

In their response brief, the Wests argue that "if an agency does not follow its own Regulations in taking administrative action against an individual, it violates the Liberty component of the Due Process Clause." (DE 29, Response at 13.) As authority for that proposition, they cite the Supreme Court's 1954 decision in *Accardi v. Shaughnessy*, 347 U.S. 260 (1954). In that case, the Court held that a habeas petitioner was entitled to relief on his claim that the Board of Immigration Appeals had violated its own regulations by prejudging and then denying his application for suspension of deportation, based on the fact that the he had been named earlier on a list of people that the Attorney General wanted to deport.

The Fifth Circuit has stated that "the *Accardi* doctrine stands for the unremarkable proposition that an agency must abide by its own regulations." *Richardson v. Joslin*, 501 F.3d 415, 418 (5th Cir. 2007) (citation and quotations omitted). Nevertheless, "[i]dentifying the legal source for the Supreme Court's pronouncement that government agencies are bound to follow their own rules is no

simple matter." *Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 48 (D.D.C. 1998). "To say that the *Accardi* principle is poorly theorized would be an understatement. The Supreme Court has never settled on an explanation for the source of this duty." Thomas W. Merrill, *The Accardi Principle*, 74 Geo. Wash. L. Rev. 569 (2006). Fortunately, this case does not require the Court to "delve into the murky waters of the [*Accardi*] doctrine and its origin." *Jefferson v. Harris*, 285 F. Supp. 3d 173, 185 (D.D.C. 2018). This is because both the Sixth Circuit and the Supreme Court have stated that, whatever the basis for the doctrine is, it is not rooted in due process.

The Sixth Circuit has explained that the agency action in *Accardi* was reversed for violations of the agency's own regulations, "but the [Supreme Court] did not rely on the Due Process Clause." *Bates v. Sponberg*, 547 F.2d 325, 330 (6th Cir. 1976). Later, the Supreme Court confirmed this view stating *Accardi* "enunciate[s] principles of federal administrative law rather than of constitutional law binding upon the States." *Bd. of Curators v. Horowitz*, 435 U.S. 78, 92 n. 8 (1978). *See also Lojeski v. Boandl*, 788 F.2d 196, 199 (3d Cir. 1986) (stating that *Accardi* and its progeny "provide ample guidance to courts asked to reverse 'tainted' agency actions, but do not enunciate constitutional principles to take the courts beyond the realm of administrative law.").

Whatever the significance of *Accardi*, it does not change the long-established principle "that the violation of a state statute or regulation is insufficient alone to make a claim cognizable under § 1983." *Stanley v. Vining*, 602 F.3d 767, 769 (6th

Cir. 2010). *See also Bates*, 547 F.2d 331 ("Since 42 U.S.C. § 1983 offers relief only to those persons whose federal statutory or federal constitutional rights have been violated, we conclude that the mere departure from the university regulations, standing alone, did not deprive Bates of any right which can be asserted in this court.")

Nor does *Accardi* change the requirement that, in order to assert a procedural due process claim, the plaintiff must establish that one of the interests protected under the due process clause – life, liberty, or property – is implicated by the government's conduct. *Thomas*, 304 F.3d at 576. *See also*; *Hall v. E.E.O.C.*, 456 F. Supp. 695, 703 (N.D. Cal. 1978) ("But the message of [*Accardi*] remains clear that an agency's violation of its regulations is not a violation of due process if no interests within the protection of the due process clause are involved.")

The Wests have not established that the defendants' conduct deprived them of a protected life, liberty, or property interest. Accordingly, their procedural due process claim based upon how the stewards arrived at the decision to disqualify Maximum Security must be dismissed. For the same reason, the Wests' vagueness challenge to Section 12 must also be dismissed.

## IV.    Conclusion

For all these reasons, the Court hereby ORDERS as follows:

1) the defendants' motion to dismiss (DE 19) is GRANTED;

2) the plaintiffs' motion for summary judgment (DE 15) is DENIED as moot; and

3) Finding no hearing on this motion necessary, the Court further hereby ORDERS that the plaintiffs' motion for a hearing (DE 27) is DENIED.

Dated November 15, 2019

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY